UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CONTINENTAL WESTERN   )
INSURANCE COMPANY,    )
            )
    Plaintiff,     )   Case No. 21-cv-1571
            )
   v.        )   Hon. Steven C. Seeger
            )
CHEESE MERCHANTS OF   )
AMERICA, LLC, and ZACK WYPYCH, )
            )
    Defendants.   )
_____)

## MEMORANDUM OPINION AND ORDER

This case is about insurance coverage for a state court claim under the Illinois Biometric

Information Privacy Act ("BIPA") against Cheese Merchants of America, a premium cheese

processing and packaging company. The insurer, Continental Western Insurance Company, filed

suit for a declaratory judgment about its duty to defend. Continental Western later moved for

judgment on the pleadings.

For the reasons stated below, Continental Western's motion for judgment on the

pleadings is granted in part and denied in part.

### Background

For a motion for judgment on the pleadings, the Court accepts all well-pled facts as true.

*See Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019); *see also* 5C Charles Alan Wright &

Arthur R. Miller, Federal Practice & Procedure § 1368 (3d ed. 2020) ("[A]ll of the well pleaded

factual allegations in the adversary's pleadings are assumed to be true and all contravening

assertions in the movant's pleadings are taken to be false.").

Cheese Merchants is a premium cheese processing and packaging company located in Cook County. *See* Am. Cplt., at ¶¶ 1, 8 (Dckt. No. 22). In February 2020, Zack Wypych, a former employee, filed a putative class action against Cheese Merchants in state court under BIPA. *Id.* at ¶¶ 6, 20.

According to the state court complaint, Cheese Merchants uses a biometric time tracking system that scans the backs of employees' hands for authentication. *Id.* at ¶ 9. When employees start at Cheese Merchants, they have their hands scanned to enroll in a "hand geometric database." *Id.* at ¶ 16. Then, employees use that database regularly, scanning their hands to punch in and out of work. *Id.* at ¶ 17. According to Wypych, that practice violates BIPA, because the company took his biometric information without his consent. *Id.* at ¶¶ 7, 15.

Continental Western is Cheese Merchants's insurance company. *Id.* at ¶¶ 1, 29. It issued Cheese Merchants multi-peril commercial lines insurance policies covering the period of July 1, 2015, through January 3, 2018. *Id.* at ¶ 25. Those policies provided commercial general liability coverage and commercial umbrella coverage. *Id.*

The parties don't provide the backstory, but apparently, Continental Western got wind of the state court case filed by Wypych. So, in March 2021, Continental Western filed this federal lawsuit, seeking a declaratory judgment that it had no duty under the policies. *See* Cplt. (Dckt. No. 1). Continental Western later amended the complaint, advancing ten counts. *See* Am. Cplt. (Dckt. No. 22).

Each count alleges that Continental Western does not have a duty to defend (*i.e.*, an obligation to defend Cheese Merchants in the underlying suit) because of language in the policies or a policy exclusion. Relevant here, Continental Western alleges that three exclusions in the policies bar coverage. The insurer relies upon (1) the "violation of law" exclusion (Count III);

2

(2) the "disclosure of personal information" exclusion (Count IV); and (3) the "employment-related practices" exclusion (Count VI). *Id.* at ¶¶ 43–54, 64–69.

Continental Western moved for judgment on the pleadings, arguing that the three exclusions bar coverage. *See* Pl.'s Mtn. for Judgment on the Pleadings (Dckt. No. 24); Pl.'s Mem., at 15 (Dckt. No. 27). Continental Western also argued that Cheese Merchants's affirmative defenses fail as a matter of law, and that it is entitled to judgment on Cheese Merchant's counterclaims. *Id.* at 13–15.

## Legal Standard

A party may move for judgment on the pleadings any time after the pleadings are closed. *See* Fed. R. Civ. P. 12(c); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). "Judgment on the pleadings is appropriate when there are no disputed issues of material fact and it is clear that the moving party . . . is entitled to judgment as a matter of law." *Unite Here Loc. 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017).

As the name suggests, a motion for judgment on the pleadings depends on the content of the pleadings alone. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The pleadings include the complaint, the answer, and any accompanying written instruments attached as exhibits. *Id.* at 452–53; *see also Arethas v. S/TEC Grp., Inc.*, 2005 WL 991782, at *6 (N.D. Ill. 2005) ("[A]lthough in ruling on a motion for judgment on the pleadings a court can consider affidavits attached to a complaint or an answer to the complaint, a court cannot consider affidavits that are not a part of the pleadings."). A motion for judgment on the pleadings is appropriate when the complaint can't get off the ground, and blows up on the launchpad.

The standard is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Armada (Sing.) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1092 (7th Cir. 2018). "To survive a motion for judgment on the pleadings, a complaint must state a claim to relief that is plausible on its face." *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (cleaned up). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing a motion for judgment on the pleadings, the Court draws "all reasonable inferences and facts in favor of the nonmovant, but need not accept as true any legal assertions." *Id.*

## Analysis

"Under Illinois law, 'an insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies.'" *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015) (cleaned up) (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill. 2d 11, 291 Ill. Dec. 269, 823 N.E.2d 561, 564 (2005)); *see also Scottsdale Ins. Co. v. Columbia Ins. Grp.*, 972 F.3d 915, 919 (7th Cir. 2020).

The "primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Hobbs*, 823 N.E.2d at 564; *see also Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 305 Ill. Dec. 533, 856 N.E.2d 338, 343 (2006). "If the words used in the policy are unambiguous, they are given their plain, ordinary, and popular meaning." *Country Mut. Ins. Co.*, 856 N.E.2d at 343.

"An insurance policy must be construed as a whole, giving effect to every provision." *Id.* at 342–43. "All provisions of the policy should be read together; every part of the contract must

4

be given meaning, so no part is meaningless or surplusage." *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 503 F. Supp. 3d 602, 606 (N.D. Ill. 2020).

"Although insurance policies are construed liberally in favor of coverage, this rule of construction comes into play only when the policy language is ambiguous." *Id.* "Whether an ambiguity exists turns on whether the language in the policy is susceptible of more than one reasonable interpretation." *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc.*, 785 F. Supp. 2d 722, 727 (N.D. Ill. 2011). The test of ambiguity is what a reasonable person in the position of the insured would understand them to mean, not what the insurer intended its words to mean. *See Ins. Co. of Illinois v. Markogiannakis*, 188 Ill. App. 3d 643, 136 Ill. Dec. 307, 544 N.E.2d 1082, 1089 (1989).

"The insurer bears the burden of establishing that it has no duty to defend," which "includes affirmatively demonstrating the applicability of an exclusion." *Skolnik v. Allied Prop. & Cas. Ins. Co.*, 2015 IL App (1st) 142438, 399 Ill. Dec. 171, 45 N.E.3d 1161, 1167 (2015). "Courts also narrowly read any policy provision that purports to exclude or limit coverage, and apply them only where the terms are clear, definite, and specific." *Id.* at 1167 (cleaned up). "A decision to excuse an insurer's duty to defend based on an exclusionary clause in the contract 'must be clear and free from doubt.' Reasonable disagreement about the applicability of an exclusion must be resolved in favor of the insured." *Zurich Am. Ins. Co. v. Ocwen Fin. Corp.*, 990 F.3d 1073, 1078 (7th Cir. 2021); *see also Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 330 (7th Cir. 2021) ("Exclusions are construed against the insurer and 'liberally in favor of the insured.'").

Continental Western argues that three policy exclusions bar coverage, and that Cheese Merchants's affirmative defenses fail as a matter of law. The Court will address each of the exclusions, and then the defenses.

## I. Employment-Related Practices Exclusion

The Court begins with the most straightforward exclusion of the bunch, the exclusion for employment-related practices. Continental Western argues that the underlying lawsuit in state court is about an employment practice, and thus falls within an exclusion in the policy. *See* Pl.'s Mem., at 12 (Dckt. No. 27).

The policies contain an exclusion that bars coverage for certain employment-related claims:

> This insurance does not apply to:
>
> "Personal and advertising injury" to:
>
> **(1)** A person arising out of any:
>
> > **(a)** Refusal to employ that person;
> >
> > **(b)** Termination of that person's employment; or
> >
> > **(c)** Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; . . . .

*See* Insurance Policies, at 264, 417–18, 717, 871–72 (Dckt. No. 22-2). That exclusion is a frequent flier in insurance policies. *See, e.g.*, *State Auto. Mut. Ins. Co. v. Tony's Finer Foods Enters., Inc.*, 2022 WL 683688, at *5 (N.D. Ill. 2022); *Citizens Ins. Co. of Am. v. Highland Baking Co.*, 2022 WL 1210709, at *1 (N.D. Ill. 2022); *Citizens Ins. Co. of Am.*

*v. Thermoflex Waukegan, LLC*, 2022 WL 602534, at *4 (N.D. Ill. 2022); *Am. Fam. Mut.*
*Ins. Co. v. Carnagio Enters., Inc.*, 2022 WL 952533, at *2 (N.D. Ill. 2022).

At this point, the case law is a well-worn path. This Court recently considered
whether an employment-related practices exclusion bars coverage in another case about
BIPA. *See Tony's Finer Foods*, 2022 WL 683688, at *5. In *Tony's*, this Court
concluded that BIPA claims do not fall within the exclusion for employment-related
practices. *Id.* at *9.

Strictly speaking, using one's hand or finger to clock-in and clock-out of work is
a practice related to employment. So, at first glance, one might think that the exclusion
applies to the use of a biometric tracking system. It's a practice at work, after all.

But things look different after widening the lens and considering the complete text
and the overall structure of the provision. *Id.* at *5–9. The policy includes a list of
examples of employed-related practices, and "[u]sing one's finger to clock-in and clock-
out is an awkward fit in that string, at best." *Id.* at *7. "If someone were to add
'fingerprinting' to the list, it would stick out like a sore thumb. It is, in some sense, a
practice. But it is a categorically different type of practice than everything else in the list.
The other items involve mistreatment that is targeted at a specific employee in a direct,
personal way." *Id.* at *9. Everything else in the list involves mistreatment targeted at a
specific employee – conduct directed "at that person." None of the examples in the list
involved a generally applicable workplace policy that applied to everyone. *Id.* at *7.

"Using a finger to clock-in and clock-out is a practice or a policy, in a colloquial
sense. But it isn't the type of practice or policy envisioned by the full text of the

provision. To the extent that there is any ambiguity, the tie goes to the insured." *Id.* at *9.

Other courts in this District have reached the same conclusion, finding that the exclusion for employment-related practices does not apply to BIPA claims. *See Thermoflex Waukegan, LLC*, 2022 WL 602534, at *5; *Highland Baking Co.*, 2022 WL 1210709, at *1; *Carnagio Enters.*, 2022 WL 952533, at *5.

The same conclusion applies here. The policy in question involves the same language, and Cheese Merchants has not pointed to any authority that supports a different outcome.

The Court holds that the employment-related practices exclusion does not unambiguously preclude coverage of the BIPA claims in the *Wypych* lawsuit.

## II.     Access to Disclosure of Personal Information Exclusion

Next, Continental Western invokes an exclusion that covers access to or disclosure of confidential or personal information. *See* Pl.'s Mem., at 10 (Dckt. No. 27).

Taking a step back, the policies provide coverage for "personal and advertising injury." *See* Insurance Policies, at 230, 416, 683, 869 (Dckt. No. 22-2). The definition of that phrase includes seven subparts, and covers "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." *Id.* at 240, 426, 693, 879.

But an exclusion ratchets back the scope of coverage. The policies do not apply to injuries caused by accessing or disclosing confidential or personal information. Specifically:

> This insurance does not apply to:
>
> **Access Or Disclosure Of Confidential Or Personal Information**
>
> "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information,

> including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.
>
> This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

*See* Insurance Policies, at 259, 447, 712, 900 (Dckt. No. 22-2).

Courts in this District are split over whether this exclusion applies to BIPA claims. *Compare Thermoflex Waukegan, LLC*, 2022 WL 602534, at *6–7 (holding that the access or disclosure exclusion did not apply); *Highland Baking Co.*, 2022 WL 1210709, at *1 (same), *with Carnagio Enters.*, 2022 WL 952533, at *7 (concluding that the access or disclosure exclusion did apply).

The Court begins, as always, with the text. Right off the bat, the breadth of the language is hard to miss. The exclusion applies to claims about "any" access to, or disclosure of, any person's "confidential or personal information." *See* Insurance Policies, at 259, 447, 712, 900 (Dckt. No. 22-2).

The word "any" doesn't suggest a lot of limitations. If you wanted to pick a word to underscore the breadth of a provision, "any" would be a good choice. *See Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) ("As this Court has repeatedly explained, the word 'any' has an expansive meaning.") (cleaned up). The sweeping phrase "confidential or personal information" suggests breadth, too.

It is hard to see how a BIPA claim is not about protecting confidential or personal information. If anything, that's the whole point of the statute. "Enacted in 2008, BIPA aims to protect the privacy interests of personal biometric information, including

fingerprints." *See Herron v. Gold Standard Baking, Inc.*, 2021 WL 1340804, at *1 (N.D. Ill. 2021); *see also Wordlaw v. Enter. Leasing Co. of Chicago, LLC*, 2020 WL 7490414, at *2 (N.D. Ill. 2020) ("BIPA protects individuals' uniquely sensitive privacy interests in their personal biometric information, including their fingerprints."); *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020) ("The judgment of Illinois's General Assembly [in codifying BIPA] is that the sensitivity of biometric information and the risk of identity theft or other privacy or economic harm that may result from its dissemination, necessitates that people be given the opportunity to make informed choices about to whom and for what purpose they will relinquish control of that information."); *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1161 (7th Cir. 2021) (noting that at least one section of BIPA "protect[s] a person's privacy interest in his unique biometric data, so a noncompliant collection of biometric data amounts to an invasion of an individual's private domain, much like an act of trespass") (cleaned up).

The statute protects biometric information, and "BIPA's definition of 'biometric identifier' includes hand scans." *Thermoflex*, 2022 WL 95460, at *6; *see also* 740 ILCS 14/15 (protecting "biometric identifiers or biometric information"); 740 ILCS 14/10 ("'Biometric identifier' means a . . . scan of hand . . . .").

A hand scan may or may not be "confidential" information within the meaning of the policy. And, to be sure, "when interpreting an insurance contract, the focus is on what the parties intended the words to mean at the time of the policy's execution, not how the Illinois legislature defines biometric information in BIPA." *See Thermoflex Waukegan, LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 2022 WL 954603, at *6 (N.D. Ill. 2022). People use their hands out in the open, for all the world to see. But the scan of

10

someone's hands isn't publicly known, and the information that someone could get with your hand scan isn't publicly known, either. People don't always keep their hands to themselves, but hand scans are a different story.

Putting that aside, the applicability of the exclusion does not turn on whether a hand scan is confidential. The exclusion covers claims about "confidential or personal information." A hand scan is, by definition, personal information. That's why companies want it and use it – it is unique to a specific person.

That said, the text of the exclusion does not stop then and there. The rest of the sentence begins with "including," and a number of examples then follow. The exclusion applies to injuries arising out of access to or disclosure of confidential or personal information, "including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information." *See* Insurance Policies, at 259, 447, 712, 900 (Dckt. No. 22-2).

That phrase does not limit the scope of the preceding text. "Including" does not mean "including *only*." The list is illustrative, not exhaustive. The "word *include* does not ordinarily introduce an exhaustive list." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) (emphasis in original); *see also id.* at 226 ("When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well."); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (explaining that "including" "emphasizes the fact that that which is within is meant simply to be illustrative"); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("The text employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and

not limitative' function of the examples given . . . which thus provide only general guidance . . . ."); *Brunton v. Kruger*, 2015 IL 117663, 392 Ill. Dec. 259, 32 N.E.3d 567, 571 (2015) ("[U]sing the word 'including,' indicates a legislative intent that the list . . . that follows is nonexhaustive.").

By way of example, imagine if this Court issued an order ruling "in favor of the insurer on the exclusions, including the employment-related practices exclusion." Cheese Merchants would not think that it prevailed on the remaining exclusions.

Cheese Merchants invokes a familiar canon of construction, *ejusdem generis*, in an attempt to whittle down the reach of the exclusion. That phrase translates to "of the same kind." It provides a limiting principle when a general term follows a string of specific terms. "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *goats, cats, horses, cattle, and other animals*." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012) (emphasis in original).

Cheese Merchants points out that the phrase "confidential or personal information" does not appear in isolation. It is tailgated by the phrase "including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information." *See* Insurance Policies, at 259, 447, 712, 900 (Dckt. No. 22-2).

As Cheese Merchants sees it, the list "is limited to specific types of information traditionally associated with a company's protectable commercial secrets or an individual's financial or health information and includes things that can be created or changed." *See* Def.'s Resp., at 10 (Dckt. No. 29). In its view, the exclusion "should

apply only to a situation where certain limited information is accessed or disclosed through a data breach." *Id.* at 11; *see also id.* at 9 (arguing that the exclusion applies when "information was accessed by or disclosed to a third party through a data breach").

That reading runs into a few problems. The first problem is the first word: "including." The list gives illustrations. It does not capture anything and everything. So, for the sake of argument, imagine if *ejusdem generis* did apply, and the closing phrase "any other type of nonpublic information" only covers nonpublic information that is similar to the examples in the list. It would not matter, because the entire list is simply a list of non-exclusive examples.

By way of example, imagine going out for some stuffed pizza in downtown Chicago. Imagine if the menu offered "toppings, including pepperoni, sausage, and other meat."

The fact that the last phrase is a general term does not matter. Even if "other meat" means traditional meat for pizza (not, say, smoked turkey or walleye), the entire phrase simply illustrates the general term "toppings." You wouldn't think that a veggie pizza was out of the question. You can order mushrooms.

The same is true here. Even if the phrase "any other type of nonpublic information" picked up meaning from the preceding list, it does not matter. The whole list is illustrative anyway. The tail can't wag the dog.

And even then, Cheese Merchants can't get much mileage out of *ejusdem generis* in this particular provision. The list includes "health information," which is only a stone's throw from information about one's body (like the hand scans here). A hand scan may not be "health information" – it is about the body, but it does not say much about

13

one's health – but it is getting in the neighborhood.  And applying *ejusdem generis*
doesn't mean that the employees' hand scans must qualify as "health information."  It
simply means that the hand scan information is "of the same kind" as the examples given
in the policy.  Both types of information concern the body, are unique to an individual,
and are generally confidential.  There's no reason why hand scans are inconsistent with
an illustrative list that includes "health information."

Moreover, the reference to "health" confirms that the list is not limited to business
and commercial information.  And the inclusion of the phrase "financial information"
would make little sense if everything in the list was financial information.[1]

---

[1]  Another court in this district considered whether *ejusdem generis* applies, and concluded that it did not, because the phrase "any access to or disclosure of any person's . . . personal information" is not ambiguous.  *See Thermoflex Waukegan, LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 2022 WL 954603, at *4 (N.D. Ill. 2022) ("First, *ejusdem generis* does not apply when the language at issue is unambiguous. Here, nothing is ambiguous about the phrase '*any* access to or disclosure of any person's . . . personal information.'") (emphasis and ellipsis in original; citation omitted).  This Court lands in the same spot, but comes at it a little differently.  As this Court sees it, the correct reference point when applying *ejusdem generis* is the phrase at the end of the string ("any other type of nonpublic information"), not the phrase before the string ("confidential or personal information").  Again, the provision reads:  "'Personal and advertising injury' arising out of *any access to or disclosure of any person's* or organization's confidential or *personal information*, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or *any other type of nonpublic information*."  *See* Insurance Policies, at 259, 447, 712, 900 (Dckt. No. 22-2) (emphasis added).  *Ejusdem generis* applies when a provision includes the following pattern:  Specific, Specific, Specific, General.  In that case, the specific terms help define and cabin the general term.  *Ejusdem generis* has a "necessary specific-general sequence in the enumeration."  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 205 (2012).  "As in all the preceding examples, *ejusdem generis* has traditionally required the broad catchall language to *follow* the list of specifics . . . ."  *Id.* at 202 (emphasis in original).  Otherwise, a different canon applies.  "In all contexts other than the pattern of specific-to-general, the proper rule to invoke is the broad associated-words canon [*noscitur a sociis*], not the narrow *ejusdem generis* canon."  *Id.*; *see also Yates v. United States*, 574 U.S. 528, 545 (2015) ("A canon related to *noscitur a sociis, ejusdem generis,* counsels:  '[W]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'") (citation omitted; brackets in original).  So, as this Court sees it, the canon *noscitur a sociis*, not *ejusdem generis*, would apply to the phrase "confidential or personal information," because that phrase precedes the entire text that follows.  In other words, *ejusdem generis* sheds light on the meaning of a general term that follows specific terms, and here, that phrase is "any other type of nonpublic information," not "confidential or personal information."

14

The "data breach" theory offered by Cheese Merchants doesn't fit well with the list, either. Data breaches typically don't involve patents, which are out in the open.

The final phrase "any other type of nonpublic information" poses problems for a narrow interpretation, too. The phraseology is so broad – *any* other type – that it leaves little room for a limiting principle. But the canon of construction applies only when the text is ambiguous. *See Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 353 (7th Cir. 2006) ("*Ejusdem generis* provides guidance on how to interpret language where the meaning is not plain.").

Here, the text does not seem ambiguous at all. On its face, the exclusion covers an injury stemming from access to or disclosure of any nonpublic information, period. If you wanted to cover everything under the sun, it is hard to think of a wider umbrella than the phrase "any other type of nonpublic information."

Putting it together, the policy language is bookended with breadth. It begins with the inclusive phrase "any access to or disclosure of any person's . . . confidential or personal information." And it ends with the inclusive phrase "any other type of nonpublic information." From beginning to end, the text pushes outward, in an inclusive direction.

Cheese Merchants makes two other arguments, but they do not move the needle.

First, the insured points to the next sentence of the exclusion, which says that it "applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or

15

organization's confidential or personal information." *See* Def's. Resp., at 9 (Dckt. No. 30).

Cheese Merchants reads that provision to limit the reach of the exclusion, so that it applies "narrowly to lawsuits arising out of data breaches." *Id.* But that's not what the provision says at all. The passage in question simply confirms that the scope of the exclusion does not turn on the type of damages sought by the insured.

The phrase "even if" confirms this reading. The exclusion applies "even if" the insured seeks damages for this or that. "Even if" does not mean "only if." That is, the exclusion does not apply only if an insured suffered damages from a data breach.

Second, Cheese Merchants argues that applying the exclusion would swallow any coverage for lawsuits alleging "[p]ersonal and advertising injury . . . arising out of . . . [o]ral or written publication, in any manner, of material that violates a person's right of privacy." *See* Def's Mem., at 11 (Dckt. No. 30). In its view, coverage would become illusory. Not so.

Recall that the policies define "personal and advertising injury" to include "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." *See* Insurance Policies, at 240, 426, 693, 879 (Dckt. No. 22-2). "Under Illinois law, the right to privacy encompasses more than a person's right to the maintain the confidentiality of their personal information." *Carnagio*, 2022 WL 952533, at *10. In tort law, the right of privacy includes the right not to be placed in a false light. *Id.* (citing Restatement (Second) of Torts § 652E (1977)). The right also prohibits the appropriation of one's name or identity for personal gain. *See Villalovos v. Sundance Assocs., Inc.*, 2003 WL 115243, at *3 (N.D. Ill. 2003) (explaining that Illinois law codifies the common

law tort of appropriation) (citing Restatement (Second) of Torts § 652C (1977)).  Those torts would not necessarily fall within the exclusion because they do not inherently involve accessing or disclosing confidential or personal information.

In sum, the exclusion covers "personal information," and biometric information is personal information.  The last step is to look at the underlying claim in state court, and confirm whether it clearly falls within the exception.  It does.

Wypych (again, the underlying plaintiff) alleges that Cheese Merchants requires employees "to scan the back of their hands in its biometric time tracking system as a means of authentication."  *See Wypych* lawsuit, at ¶ 2 (Dckt. No. 22-1).  He also alleges that Cheese Merchants "unlawfully collects, stores, and uses their biometric data in violation of the BIPA."  *Id.* at ¶ 5; *see also id.* at ¶¶ 20–24.  In other words, Wypych alleges that he suffered an injury from Cheese Merchants unlawfully collecting and accessing his personal information:  his hand scan.  The underlying lawsuit falls squarely within the scope of the exclusion.

The Court concludes that the exclusion about the "access or disclosure of confidential or personal information" applies to the *Wypych* lawsuit.  Thus, Continental Western has no duty to defend.

## III.    Violation of Law Exclusion

One final exclusion remains in play.  Continental Western argues that another exclusion, the "violation of law" exclusion, bars coverage for BIPA claims.  *See* Pl.'s Mem., at 7 (Dckt. No. 27).

The provision begins with the following title:  "Recording and Distribution of Material or Information in Violation of Law."  The structure of the exclusion includes four subparts.  The

17

first three subparts exclude claims under three particular statutes, identified by name. The fourth

subpart is a catch-all, describing certain types of statutes covered by the exclusion.

The exclusion reads as follows:

This insurance does not apply to:

\*    \*    \*

**p.    Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)**    The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)**    The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)**    The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)**    Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

*See* Insurance Policies, at 232, 419, 685, 872 (Dckt. No. 22-2).

The exclusion does not expressly refer to BIPA. Even so, Continental Western

argues that a BIPA claim falls within the catch-all provision. *See* Pl.'s Mem., at 7 (Dckt.

No. 27).

Other courts in this district have wrestled with this language, and they have

landed in the same spot. Each court concluded that the exclusion does not apply to BIPA

claims. *See Citizens Ins. Co. of Am. v. Thermoflex Waukegan, LLC*, 2022 WL 602534, at

18

*5 (N.D. Ill. 2022); *Citizens Ins. Co. of Am. v. Highland Baking Co.*, 2022 WL 1210709, at *1 (N.D. Ill. 2022); *Am. Mut. Ins. Co. v. Carnagio Enters., Inc.*, 2022 WL 952533, at *6 (N.D. Ill. 2022); *Citizens Ins. Co. of Am. v. Wynndalco Enters. Co. of Am.*, 2022 WL 952534, at *3 (N.D. Ill. 2022).[2]

After tangling with the language, this Court ultimately lands in a different place. But the process of getting there is a bit of a long haul.

On its face, the last provision of the quartet sweeps broadly. *See* Insurance Policies, at 232, 419, 685, 872 (Dckt. No. 22-2). Everything about the phraseology conveys breadth. It begins with the word "any." *Id.* It covers a "statute, ordinance or regulation," under "federal, state or local law." *Id.* It includes three verbs ("addresses, prohibits, or limits"), followed by nine nouns. *Id.* To top it off, it ends with "material or information," which is about as broad and inclusive as it gets. *Id.*

If that provision is as broad as it looks, a claim under BIPA would seem to fall within its generous boundaries. It is a state statute. *Id.* And it "addresses, prohibits, or limits" the "collecting, recording, sending, transmitting, communicating or distribution" of information. *Id.* "Section 15 of the Act . . . imposes on private entities . . . various obligations regarding the collection, retention, disclosure, and destruction of biometric identifiers and biometric information." *See Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1203 (Ill. 2019); 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's

---

[2] The language of the exclusions is not identical in each case. The main difference is that some versions of the exclusion, as here, include four subparts (not three), and expressly include the Fair Credit Reporting Act. This case and *Wynndalco* are good examples. Other cases involve a narrower exclusion that does not refer to the Fair Credit Reporting Act. Examples include *Carnagio*, and the Illinois Supreme Court's decision in *West Bend*, discussed *infra*.

biometric identifier or biometric information, unless . . . ."); 740 ILCS 14/15(d) ("No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless . . . .").

But maybe that provision does not sweep as broadly as it appears. It depends on whether a limiting principle applies. And that's where *ejusdem generis* makes yet another appearance. Cheese Merchants argues that the general provision is ambiguous, and that this Court should apply *ejusdem generis* to limit its scope.

From a *structural* perspective, the exclusion looks like a good candidate for *ejusdem generis*. The fourth subpart is a general term, and it follows a string of three specific subparts. The first subpart covers the Telephone Consumer Protection Act, the second subpart covers the CAN-SPAM Act of 2003, and the third subpart invokes the Fair Credit Reporting Act. The fourth subpart talks about statutes generally. So, the structure is in place: Specific (the TCPA), Specific (the CAN-SPAM Act), Specific (the FCRA), General (other federal, state, and local statutes).

But from a *textual* perspective, things look a bit different. *Ejusdem generis* typically applies when there is a general phrase that has a cryptic quality, where there is room for doubt about the sweep of the text. Consider, once again, the example from the leading treatise: "*goats, cats, horses, cattle, and other animals*." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012) (emphasis in original). The phrase "other animals" did not consume much textual real estate. It left open an unanswered question about the *type* of animals. The writer did not take great pains to explain the scope of that phrase, leading the reader to wonder how broad it is.

20

That's not exactly what we have here. The fourth subpart of the exclusion goes to great lengths to emphasize its expansiveness. Again, it covers "[a]ny federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information." *See* Insurance Policies, at 232, 419, 685, 872 (Dckt. No. 22-2).

That's a general provision, to be sure. It does not point to specific statutes – it points to statutes generally. But it is not the type of general provision that cries out for a gap filler to fill in the cracks and give it meaning. It reads like a provision designed for an all-encompassing scope. It is difficult to read it any other way.

That's another way of saying that *ejusdem generis* does not apply when the text is unambiguous. *See United States v. Powell*, 423 U.S. 87, 91 (1975) ("The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty.") (quotation marks omitted); *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 353 (7th Cir. 2006) ("Ejusdem generis provides guidance on how to interpret language where meaning is not plain.").

And here, the text does not seem particularly ambiguous. Quite the opposite, it seems clear as a bell – and the clear message is that the provision sweeps broadly. The text is undoubtedly broad. But breadth is not the same thing as ambiguity.

That canon does not apply because the text is not ambiguous. There is another wrinkle, too. *Ejusdem generis* does not automatically apply to a phrase with a specific-specific-specific-general architecture. The canon depends on the existence of a

21

discernible theme. That is, a common thread must run through the specifics. Otherwise, they cannot tie up the reach of the general term.

*Ejusdem generis* depends on the existence of a limiting principle that jumps off the page. "The rationale for the *ejusdem generis* canon is twofold: When the initial terms all belong to an *obvious and readily identifiable genus*, one presumes that the speaker or writer has that category in mind for the entire passage." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012) (emphasis added); *see also id.* ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."); 2A Norman J. Singer, Sutherland Statutory Construction § 47.18 (7th ed. 2021) ("Of primary importance to judicious use of this doctrine, then, is understanding what, exactly, constitutes a 'class.' A 'class' is a means *easily* to qualify numerous items with similar characteristics, a generalization to associate items for a particular purpose or treatment.") (emphasis added); *Ejusdem generis*, Black's Law Dictionary (11th ed. 2019) ("A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."); *Saxon v. Southwest Airlines Co.*, 993 F.3d 492, 496 (7th Cir. 2021) ("Under the *ejusdem generis* canon of construction, general words are interpreted to reflect the 'common characteristics' of the enumerated categories that precede them."), *aff'd*, 142 S. Ct. 1783 (2022).

Unless there is a discernible principle running through all of the specifics, *ejusdem generis* does not apply, and the general term receives its full breadth. "[S]ometimes the specifics do not fit into any kind of definable category – 'the

enumeration of the specific items is so heterogeneous as to disclose no common ground.' With this type of wording, the canon does not apply." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 209 (2012) (citation omitted); *see also CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("A canon meaning literally 'of the same kind' has no application to provisions directed toward dissimilar subject matter."); 2A Norman J. Singer, Sutherland Statutory Construction § 47.20 (7th ed. 2021) ("Courts do not presume a legislature restricted a general term *ejusdem generis* with a specific enumeration . . . if the members of the enumeration, although specific, are essentially diverse in character.").

Here, tying the three statutes together is a bit of a stretch. The TCPA prohibits telemarketers from making annoying phone calls. *See* 47 U.S.C. § 227 *et seq.*; *see also Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021) ("In 1991, Congress passed the TCPA to address 'the proliferation of intrusive, nuisance calls' to consumers and businesses from telemarketers."); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2344 (2020) ("In 1991, Congress passed and President George H. W. Bush signed the Telephone Consumer Protection Act. The Act responded to a torrent of vociferous consumer complaints about intrusive robocalls.").

The second statute, the CAN-SPAM Act, follows that theme. *See* 15 U.S.C. § 7701 *et seq.* That statute "was enacted in response to the rise of unsolicited commercial e-mail." *See Martin v. CCH, Inc.*, 784 F. Supp. 2d 1000, 1003 (N.D. Ill. 2011).

Putting them together, the TCPA and the CAN-SPAM Act "protect 'privacy' by regulating unauthorized communications that private citizens *receive* (*e.g.*, telemarketing calls and spam emails)." *Wynndalco*, 2022 WL 952534, at *5. They prohibit

technological interferences with domestic tranquility – the statutory equivalent of a "No Soliciting" sign.

If the string stopped there, a reader might think that the general term continues the trend. That is, the specific examples build momentum for the notion that the general provision is about statutes that prohibit bothering people at home.

But the third provision brings all of that momentum to a screeching halt. The third statute is the Fair Credit Reporting Act. *See* 15 U.S.C. § 1681 *et seq.* That statute is not about pestering consumers at home. Unlike the TCPA and the CAN-SPAM Act, the FCRA does not govern the method of communications to consumers.

The FCRA "seeks to promote 'fair and accurate credit reporting' and to protect consumer privacy. To achieve those goals, the Act regulates the consumer reporting agencies that compile and disseminate personal information about consumers." *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). In the FCRA, Congress protected the privacy of consumers by ensuring the safekeeping of their financial information. *See Persinger v. Sw. Credit Sys., LP*, 20 F.4th 1184, 1192 (7th Cir. 2021) ("The FCRA's protection of consumer credit information is akin to the common law's protection of private information through the tort of invasion of privacy. To safeguard consumer credit information, Congress drafted § 1681b, which makes it unlawful to furnish, obtain, or use a consumer's credit information without a permissible purpose."); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) ("Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.").

24

The FCRA protects consumers in a different way than the TCPA and the CAN-SPAM Act. The FCRA protects the confidentiality of their personal information. The TCPA and the CAN-SPAM Act protect consumers from getting bugged at home with unwanted communications. They address a different type of privacy.[3]

The TCPA, the CAN-SPAM Act, and the FCRA do not share a natural connection. If someone asked you about the FCRA, and asked you to name a similar statute, you probably wouldn't pick the TCPA or the CAN-SPAM Act. If you're straining to find a theme, there's probably no theme.

Drawing a connection between all three statutes would require a high level of generality – say, statutes that protect privacy. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 207–08 (2012) (discussing how to select the right level of generality). But if the general provision means "statutes that protect privacy," one wonders why it didn't say so, squarely and directly. If that's what the provision means, it sure took a long and circuitous path to say so.

The search for a theme running through those three statutes ends in one of two places. Either there is no theme at all, or there is a theme at a high level of generality.

---

[3] Another court in this district held that the TCPA and the CAN-SPAM Act (on the one hand) and the FCRA (on the other) address different types of privacy. The TCPA and the CAN-SPAM Act "protect 'privacy' by regulating unauthorized communications that private citizens *receive* (*e.g.*, telemarketing calls and spam emails)." *Citizens Ins. Co. of Am. v. Wynndalco Enters. Co. of Am.*, 2022 WL 952534, at *6 (N.D. Ill. 2022). But the FCRA "protect[s] 'privacy' in a different sense, by regulating how private entities must handle private information that citizens *give away* (*e.g.*, credit card numbers and facial scans)." *Id.* (emphasis added). That difference means that *ejusdem generis* does not apply at all, or cannot apply *at that level of generality*. There must be a common thread running through all of the specifics parts for *ejusdem generis* to apply. *Id.* (noting that "*ejusdem generis* requires the general term to share a characteristic that is common to all the specific terms") (emphasis in original). If the TCPA and the CAN-SPAM Act protect privacy by limiting the information that consumers *receive*, and if the FCRA protects the privacy of information that consumers *provide*, then that characteristic cannot be the right level of generality. They're different, and they have to be the same for *ejusdem generis* to apply. *Ejusdem generis* applies only when the same principle applies to the specific parts of the text.

If there is no theme, then there is no limiting principle, and *ejusdem generis* does not apply. And if *ejusdem generis* does not apply, then there is no principle to constrain the sweep of the text. The general provision would apply as broadly as it appears, and would cover BIPA.

But if there is a theme, then the theme is at a high level of generality. The theme would be "statutes that protect privacy," or something along those lines. It is at such a high level of generality that it would sweep in BIPA. Applying *ejusdem generis* at that level of generality would lead to the same result as a plain reading of the provision: the exclusion applies to BIPA claims.

In sum, it appears that the text of the exclusion covers BIPA claims, and that *ejusdem generis* does not constrain the reach of the text. That canon does not seem to fit with the language of this provision, given the text of the subparts (especially the deliberate, all-inclusive sweep of the general provision). If *ejusdem generis* applies at all, it applies only if there is a principle with a high level of generality – so high that it includes BIPA anyway.

If this Court wrote on a blank slate, it would be tempting to stop there, and conclude that the exclusion applies to BIPA claims. But this Court does not write on a blank slate. This Court sits in diversity, applying Illinois law. The objective is to predict what the Illinois Supreme Court would do. *See Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) ("As a federal court sitting in diversity jurisdiction, our task is to predict how the Illinois Supreme Court would decide issues presented here."); *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 499 (7th Cir. 2012) ("Our duty is to interpret the Act as best we predict the Illinois

26

Supreme Court would."); *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").

This Court must predict what the Illinois Supreme Court would do if faced with this exclusion. And here, the slate is not blank – if anything, it is nearly full.

The Illinois Supreme Court confronted a similar exclusion last year. *See W. Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*, 183 N.E.3d 47 (Ill. 2021). There, as here, an insurance company sought a declaratory judgment that a "violation of statutes" exclusion barred coverage for a claim under BIPA. The Illinois Supreme Court concluded that the exclusion did not apply.

At first blush, the exclusion in *West Bend* looked a lot like the exclusion at issue here. The exclusion in *West Bend* included three subparts (not four, like the exclusion at issue here). The first subpart excluded claims under the TCPA, and the second subpart excluded claims under the CAN-SPAM Act. *Id.* at 52. The third and final subpart was the catchall provision. It applied to claims under "[a]ny statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information." *Id.*

The Illinois Supreme Court began with the title of the exclusion, "Violation of Statutes that Govern E-Mails, Fax, Phone Calls *or Other Methods* of Sending Material or Information." *Id.* at 60 (emphasis in original). That title suggested that the exclusion covered statutes governing the method of communications. *Id.*

27

The Illinois Supreme Court then dug into the text of the exclusion itself. The Illinois Supreme Court identified a theme running through the two statutes in the exclusion. The TCPA "regulates the use of certain *methods* of communication," and the CAN-SPAM Act "regulates the use of electronic mail." *Id.* (emphasis in original). In other words, "the specific words used in the exclusion are two statutes that regulate methods of communication." *Id.*

Based on that thematic consistency, the Illinois Supreme Court applied *ejusdem generis* to the text. The common ground created a limiting principle when interpreting the general provision. "Here, the general words 'other than' follow the enumeration of words with a specific meaning, the TCPA and the CAN-SPAM Act. Applying the doctrine of *ejusdem generis*, we construe the 'other than' language to mean other statutes of the same general kind that regulate methods of communication like the TCPA and the CAN-SPAM Act." *Id.*; *see also id.* at 61 ("Therefore, under the doctrine of *ejusdem generis* and our rules of insurance contract construction, we construe the violation of statutes exclusion to apply only to statutes like the TCPA and the CAN-SPAM Act, which regulate methods of communication like telephone calls, faxes, and e-mails.").

But BIPA stuck out from the crowd. *Id.* at 60. BIPA, "on the other hand, does not regulate methods of communication but regulates the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." *Id*. BIPA was "fundamentally different" than the other two statutes: "We find that regulating telephone calls, faxes, and e-mails is fundamentally different from regulating the collection, use, storage, and retention of biometric identifiers and information (fingerprints, retina or iris scans, voiceprints, or scans of hand or face geometry)." *Id.*

28

The Illinois Supreme Court ultimately held that the exclusion did not apply because BIPA does not regulate methods of communication. "Therefore, since the Act is not a statute of the same kind as the TCPA and the CAN-SPAM Act and since the Act does not regulate methods of communication, the violation of statutes exclusion does not apply to the Act." *Id.* at 60.

To be sure, *West Bend* laid down a marker. The Illinois Supreme Court addressed the same type of BIPA claim, construed a similar exclusion, and found that it did not apply. That holding creates strong positive momentum.

But the exclusion at hand is materially different than the exclusion in *West Bend*. For starters, the Supreme Court in *West Bend* began its analysis with the title of the exclusion, "Violation of Statutes that Govern E-Mails, Fax, Phone Calls *or Other Methods* of Sending Material or Information." *Id.* (emphasis in original).

But here, the title of the exclusion is different: "Recording And Distribution Of Material Or Information In Violation Of Law." *See* Insurance Policies, at 232, 419, 685, 872 (Dckt. No. 22-2). Unlike the title of the exclusion in *West Bend*, the title of the exclusion here sounds like it has room for BIPA claims. The expanse of the title says something about the expanse of the exclusion. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012) ("The title and headings are permissible indicators of meaning.").

More importantly, the text at issue here is different than the text at issue in *West Bend* in important ways. The text here includes a list of three specific statutes (not two): the TCPA, the CAN-SPAM Act, and the FCRA. They do not share much of a common thread, and *ejusdem generis* applies only *if there is a common thread*. Again, maybe the

29

common thread is the protection of privacy. But if that's the case, then BIPA fits within the exclusion, too, because BIPA protects privacy.

Without a common thread, there is nothing to restrain the reach of the general provision. In other words, the specific examples do not reveal a theme that limits the natural application of the plain language of the general term. It is as broad as it looks.

The inclusion of the FCRA is a pretty strong clue about the meaning of the overall text. The FCRA protects personal financial information, and places restrictions on what third parties can do with it. If the exclusion applies to claims about personal financial information, it is hard to see why it would not apply to claims about personal biometric information.

It would be strange to read the general provision in a way that would exclude any of the specific examples. If the provision said "bananas, coconuts, brisket, and other food," you wouldn't think that "other food" was limited to tropical fruits. "Brisket" informs the meaning of "other food." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 196 (2012) ("The common quality suggested by a listing should be its most general quality – the least common denominator, so to speak – relevant to the context.").

So too here. The exclusion expressly covers the Fair Credit Reporting Act. The reference to the FCRA informs the meaning of the general provision, and underscores its breadth.

*Ejusdem generis* is not the only tool in the interpretation toolbox. Another canon is the principle that the text must be read as a whole. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("The text must be construed as a

whole.").  A related principle is that associated words shed light on each other's meaning. *See* Scalia & Garner, at 196 (discussing *noscitur a sociis*).  Here, the words of the exclusion aren't exactly next door – it's a long provision – but they're on the same block in the same overall neighborhood.  All of the words of the exclusion appear in the same sentence, so each of them contributes something to the overall meaning.

The inclusion of the FCRA makes this case meaningfully different than *West Bend*.  The Illinois Supreme Court confronted an exclusion with a strong thematic current running through all of the specific examples.  The Illinois Supreme Court naturally concluded that the general provision must cover the same type of ground.

But here, the exclusion covers two types of privacy statutes:  two statutes that protect privacy when communicating with consumers (the TCPA and the CAN-SPAM Act), and one statute that protects the privacy of information given by consumers (the FCRA).  The inclusion of the FCRA expands the scope of the exclusion.  And it signals that the general provision is not limited to communicating with consumers.

In sum, this Court predicts that the Illinois Supreme Court would recognize the material expansion of the text, and conclude that the exclusion applies.  Unlike the provision in *West Bend*, there is no reason to think that this particular provision is limited to providing information to consumers.  And in fact, there is a compelling reason to think that it is not.

The Court therefore holds that the violation of law exclusion at issue here applies to the BIPA claims brought against Cheese Merchants.

31

## IV. Counterclaims

Finally, Continental Western seeks judgment on the pleadings for the counterclaims advanced by Cheese Merchants. *See* Pl.'s Mem., at 14 (Dckt. No. 27). The counterclaims contain two counts. *See* Counterclaim (Dckt. No. 25 at 45 of 51). Count I seeks a declaratory judgment that Continental Western has a duty to defend Cheese Merchants in the *Wypych* lawsuit. *Id.* at ¶¶ 24–27. Count II is a breach of contract claim alleging that Continental Western breached its contractual obligations by failing to defend Cheese Merchants in the *Wypych* lawsuit. *Id.* at ¶ 30.

This Court has concluded that two exclusions apply, so the Court also grants judgment on the pleadings for the counterclaims. Continental Western has no duty to defend. And without a duty to defend, it could not breach its contractual obligations by failing to provide a defense.

### Conclusion

The motion for judgment on the pleadings is granted in part and denied in part. The motion is denied to the extent that Continental Western seeks judgment in its favor based on the "employment-related practices" exclusion. The motion is granted to the extent that Continental Western seeks judgment in its favor based on the "access or disclosure of confidential or personal information" exclusion. The motion is granted to the extent that Continental Western seeks judgment in its favor based on the "violation of law" exclusion. Finally, the motion for judgment on the pleadings is granted to the extent that Continental Western seeks judgment on the counterclaims.

Date: September 27, 2022

_____

Steven C. Seeger
United States District Judge